THE NATIONAL TRUST COMPANY OF THE CITY OF NEW YORK

v.

ELIAS N. MILLER, receiver of the Silver Spring Paper Company.

1. Independent of the statute, and simply as a matter of courtesy, this court may extend its aid to the receiver of a foreign corporation, for the purpose of enabling him to get possession of property, which should, in equity, be applied in payment of the debts of the corporation.

2. This court may appoint a receiver of a foreign corporation having property in this state, as auxiliary to the proceeding instituted against it in the state which created it, and confer upon him the same powers that it is authorized to grant to the receiver of a domestic corporation, so far as they may be necessary to the recovery and collection of the assets of the corporation.

3. And the court is bound to give such receiver the same remedies and aid, in the collection of the assets of the corporation he represents, that it would give to the receiver of a domestic corporation.

4. It is a cardinal rule of the law of corporations, that a corporation created by statute can exercise no power, and has no rights, except such as are expressly given, or necessarily implied.

5. Nor can the powers of a corporation be in the slightest degree enlarged or extended by the assent of the stockholders, or by any action they may take.

6. A contract not within the scope of the powers conferred on a corporation, cannot be made valid by the assent of every one of the shareholders, nor can it by any partial performance become the foundation of a right of action.

7. Equity regards the property of a corporation as a fund held in trust for the payment of its debts, and if others than *bona fide* creditors of the corporation or purchasers possess themselves of it, they take it charged with this trust, which a court of equity will enforce against them.

On final hearing; on bill, answers and proofs taken before the vice-chancellor.

*Mr. Thomas N. McCarter* and *Mr. Joseph D. Bedle*, for complainants.

*Mr. A. Q. Keasbey*, for defendant.

THE VICE-CHANCELLOR.

This is a foreclosure suit, in which the validity of the mortgage, upon which it is founded, is disputed. The mortgage, it

is contended, is void, first, because it is in fact, though not in form, the deed of a corporation that had no authority to make it, for the purpose for which it was made; and second, because it is the instrument, by which the officers of the corporation, in whose behalf it was made, have attempted to effect a misappropriation of its assets in fraud of the rights of the creditors. The leading facts are almost entirely free from doubt or dispute. The mortgage bears date February 26th, 1874, and was made by Willie A. Tenney to the complainants. Just prior to its date the complainants were the owners of first mortgage bonds of the Chicago, Danville and Vincennes Railroad Company, to the amount of $298,000, upon which default in the payment of interest, due October 1st, 1873, had been made. The officers of the railroad company, for the purpose of maintaining themselves in the control of the road, put on foot a scheme by which they hoped to get the bondholders to consent to accept new obligations for the interest in arrear. The complainants opposed the scheme with such effect that the officers of the railroad company deemed it advisable to purchase their bonds. They agreed to pay $253,300 for them, in four instalments, with an interval of six months between each payment. The mortgage in suit was given as collateral security for the payment of these instalments. The railroad company paid no money on account of the purchase, and no other security was given, except that the complainants were to retain the bonds until they were paid for. At the time the bonds were purchased, the mortgaged premises belonged to the Silver Spring Paper Company, and constituted nearly the whole of its assets. The stock of the paper company at this time was owned wholly by Amos Tenney and William D. Judson, and their wives and children, and these two gentlemen were prominent officers in both corporations, Mr. Tenney being the president and treasurer, and Mr. Judson a director of the paper company, and Mr. Judson being the president, and Mr. Tenney a director of the railroad company. By the terms of the contract of sale, the railroad company agreed to procure the paper company to execute a mortgage to the complainants for $50,000, as collateral security for the payment of the price of the bonds, and the paper

company, afterwards, adopted a resolution authorizing the execution of such mortgage to the complainants. This resolution was subsequently rescinded, and another passed authorizing a conveyance of the mortgaged premises to William D. Judson, ostensibly in fulfilment of a contract of sale, for a consideration of $150,000, which, the resolution stated, was to be paid or satisfactorily secured. This resolution was adopted January 27th, 1874. On this last date, a substitute was adopted directing a conveyance to be made to Willie A. Tenney, apparently in execution of a contract of sale. About the date of the adoption of this last resolution, the stockholders of the paper company executed a paper to the complainants, assenting to the conveyance to be made to Tenney, acknowledging the receipt, by the paper company, of the full consideration to be paid by Tenney, and releasing the complainants from all obligation to see to the payment securing an application of the purchase-money. Under this last resolution, the mortgaged premises were conveyed by the paper company to Willie A. Tenney, who, immediately on receiving title, executed the mortgage in suit to the complainants, and two days afterwards reconveyed the mortgaged premises to the paper company, subject to the mortgage. The mortgage conforms in its terms to the requirements of the contract of sale of the bonds, made by the complainants with the railroad company. The arrangement between Tenney and the complainants provides, in express terms, that he should incur no personal liability by the execution of the mortgage. No contract of sale ever existed between the paper company and Tenney. The whole arrangement, so far as they were concerned, was a mere artifice, devised to throw around the execution of the mortgage a very thin appearance of legality. The assets of the paper company, at this time, were worth, according to the estimate of the complainants, about $90,000—other estimates put them at a much lower figure—and its liabilities amounted to about $35,000, some of which are still outstanding and unpaid. If the complainants' estimate is accepted as correct, and the mortgage is regarded as a valid instrument, it is quite clear that the execution of the mortgage plunged the paper company into a state of hopeless insolvency. It was im-

possible to abstract $50,000 from its available means, leaving it but $40,000 to pay its debts and to foster its business, at a time when almost all kinds of property were rapidly declining in value, without producing that result. The railroad company having failed to pay the first instalment falling due under their contract in the purchase of the bonds, this suit was brought to compel the payment of the mortgage.

Both the complainants and the paper company are corporations created under the laws of the state of New York. Since the commencement of this suit, this court appointed the defendant Miller receiver of the paper company, upon a petition by certain of its creditors, representing that all its property was located in this state, that it had suspended its business and become insolvent, and that a receiver had been duly appointed in New York for the purpose of winding it up and making an equal distribution of its property. He was subsequently admitted, on order, as a defendant, and allowed to answer. The questions in dispute arise mainly on his answer.

The complainants deny the receiver's right or capacity to assail the validity of their mortgage, their contention being that he simply represents the corporation, and must therefore take its property subject to all such charges as the corporation itself would not be permitted to gainsay. This contention, it will be observed, assumes that the mortgage is valid against the corporation. Without expressing any opinion upon that question now, I must say that I do not think it is true, either as a matter of fact or law, that the receiver represents only the corporation. He is not created by the corporation, nor does he derive his power or his title from it, but he is brought into existence by the same authority that gave life to the corporation. He is invested with title by the act of the law. He is a creation of the law for the protection of the rights of creditors, and must necessarily be clothed with their attributes and equities to accomplish the purpose of his creation. He represents both the corporation and its creditors, and is invested with the rights and powers of both, so far as may be necessary to perform his functions.

Independent of statutory provision, and simply as a matter of

comity, this court will extend its aid to the receiver of a foreign corporation, for the purpose of enabling him to get the possession of property which should, in equity, be applied in payment of its debts. *Bidlack* v. *Mason, 11 C. E. Gr. 230.* In that case, a receiver, appointed under the laws of New York, filed a bill, in this court, asking to have a judgment recovered in the supreme court of this state against the corporation which he represented, and a sheriff's sale made under it, set aside, on the ground that the judgment was fraudulent, and had been used to put the property of the corporation beyond the reach of its honest creditors. A receiver was appointed to take possession of the property and hold it during the litigation. By express provision, foreign corporations, doing business in this state, are made subject to all the provisions of our statute concerning corporations, so far as the same can be applied to foreign corporations. *Rev. 196 § 103.* The design of this enactment seems to me to be very plain. The legislative design was, unquestionably, to confer upon this court the same powers, in respect to insolvent corporations, created by foreign jurisdictions, having property in this state, that it exercised over insolvent domestic corporations, so far, at least, as the exercise of such powers was necessary to the recovery of any assets, whether legal or equitable, which should go in discharge of debts. Under this statute, I think this court may appoint a receiver auxiliary to the proceeding instituted against a foreign corporation, in the state which created it, and may properly invest him with the same powers, so far as they are necessary to the collection and recovery of its assets, that it is authorized to grant to the receiver of a domestic corporation. And I think it is bound, not only in virtue of this statute, but by the principles of a just comity, to extend to him the same remedies and rules of judgment, in the recovery of the assets of the corporation, that it would give to the receiver of a domestic corporation.

The order of appointment in this case invests the defendant with the full measure of power authorized by the statute. He is given full power and authority to demand, sue for, collect, receive and take into his possession all rights, credits and property of every description, belonging to the corporation at the time of its

insolvency.   Under a much less comprehensive grant it has been
decided by the court of errors and appeals that a receiver ap-
pointed under the statute providing a method for the discovery
of property belonging to a judgment-debtor, has capacity to
maintain a suit in equity to annul a sale of personal property
made in fraud of creditors, or to remove fraudulent liens placed
thereon.   *Miller* v. *Mackenzie, 2 Stew. Eq. 291.*   There can be no
doubt, under the rule established by this adjudication, that it
would be competent for the receiver in this case, in his official
character, to bring a suit in equity to nullify the mortgage in
question.   He holds the title to the mortgaged premises; he
alone has a right to their possession, and he alone can sell and
convey them.   Adopting an argument very forcibly put in the
case just cited, we may say it cannot be pretended, if the mortga-
gees were in possession, that this receiver could not maintain an
action of ejectment against them, and if he established the fact
that the mortgage was a fraud upon creditors, that he would not
be entitled to recover.   Why, if this be so, is he to be confined
to such action, and to be excluded from taking his case before a
tribunal that is competent not only to adjudge with regard to his
right to the property, but also to remove from it a fraudulent and
pretended claim, which, so long as it exists, renders it unsalable
in his hands?   His right of action and his right of defence are,
in this instance, in my apprehension, reciprocal, and if he has
produced sufficient evidence of the invalidity of the mortgage to
entitle him, if he were complainant, to a decree so adjudging, he
is, upon the same evidence, entitled to a decree of dismissal.
Where it appears that a corporation is attempting, by suit, to en-
force a contract which it had no power to make, and the con-
tract, for that reason, is void, the defendant may avail himself
of this defence by answer.   *Trenton Mutual Life & Fire Ins. Co.*
v. *McKelway, 1 Beas. 133.*

In my judgment, the receiver stands before the court invested
with the rights and equities of the creditors of the paper com-
pany, and has therefore a right to ask judgment against this
mortgage, if he has shown that it was executed in fraud of their
rights.

This brings us to the question, is this mortgage a valid instrument against the creditors of the paper company? And the creditors here meant are those whose claims accrued subsequent to the execution of the mortgage as well as those whose claims existed at its date. The paper company was formed to manufacture paper, and to vend and sell the same. No other purpose or object is expressed in its certificate of incorporation. Prior to the execution of the mortgage, it had no business relation, connection or transaction with the railroad company or the complainants. A foreign corporation, owning lands in this state, may, under our statute, convey or mortgage them. *Rev. 195 § 99.* The conveyance by the paper company to Tenney was, in everything but its form, a mortgage. The title was put in him merely to enable him to do what the paper company wanted to do itself, but what it could not do itself without having the papers display upon their face the rank illegality of the transaction. The conveyance to him was an artifice invented to hide the real nature of the transaction. The complainants, if not participants in the invention of this crooked scheme, accepted their mortgage with full knowledge of it. The evidence on this point is conclusive. It is found, first, in the original contract, which provided that the paper company should execute a mortgage directly to the complainants; second, in the terms of the mortgage itself—for if the complainants had for one moment supposed that Tenney was an actual purchaser, and had, in good faith, agreed to pay $150,000 for the mortgaged premises, it cannot be believed that they would, without consideration, have relieved him from all personal liability for the mortgage debt. Why should they? In that case he would have been bound, in law and honor, to pay the whole of the purchase-money, and they could have had no possible motive or reason for relieving him, gratuitously, from any part of his obligation. But if they understood that he was used simply as an instrument in a scheme to accomplish, by indirection, what the paper company could not do directly, then it is easy to understand their conduct. And, third, in the fact that the complainants accepted an assent, executed to themselves by the stockholders of the paper company,

assenting to the conveyance to Tenney, and releasing the complainants from all obligation to see to the payment or application of the purchase-money. It is impossible to misunderstand the meaning of these facts, or to misinterpret their force.

The validity of this mortgage is indefensible except on the theory that it was within the scope of the powers of the paper company to donate the half or the whole of its property to the railroad company, regardless of the rights of its creditors or the public. It is clear it possessed no such power, and if it had attempted to do so, by open and direct means, its act would have been so conspicuously *ultra vires* as to strip it of the least appearance of validity. It is a cardinal rule of the law of corporations that a corporation created by statute can exercise no power, and has no rights, except such as are expressly given or necessarily implied. *Huntington* v. *Savings Bank, 96 U. S. 388; Grant on Corp. 13; Ang. & Ames on Corp.* § *111; Green's Brice 29.* This rule, for a long time, has formed part of our statutory system. *R. S. 136* § *3; Rev. 177* § *3; Trenton Mutual Life & Fire Ins. Co.* v. *McKelway, 1 Beas. 133.* Nor can the powers of a corporation be in the slightest degree enlarged or extended by the assent of its stockholders, or by any action they may take. In *Black* v. *Delaware and Raritan Canal Co., 9 C. E. Gr. 455,* the court of errors and appeals affirmed that no majority of stockholders, however large, has a right to divert one cent of the joint capital to any purpose not consistent with and growing out of the original fundamental purpose of the corporation. And the supreme court of the United States has recently declared, following a judgment of the house of lords, in which the present lord chancellor (Selborne) and the late lord chancellor (Cairns), and Lords Chelmsford, Hatherly and O'Hagan concurred, that the broad doctrine is now established that a contract, not within the scope of the powers conferred on a corporation, cannot be made valid by the consent of every one of the shareholders, nor can it, by any partial performance, become the foundation of a right of action. *Thomas* v. *West Jersey R. R. Co., 101 U. S. 71.* While it must be admitted that this doctrine has not received the sanction of every eminent

National Trust Co. *v.* Miller.

judge who has been called upon to enforce it, yet I think it is now vouched for by such august authority, and is so manifestly supported by sound reason and the highest considerations of policy, that it must hereafter be accepted, universally, as expressing the true rule of judgment in such cases.

I am of opinion that it was not within the scope of the powers of the paper company to donate the half of its property, or to do what was practically the same thing, to make a gratuitous pledge of its property for the debt of another corporation. Nor do I think it could do by indirection what it was incompetent to do directly.

There is another important principle which I think it is my duty to enforce in deciding this case. Equity regards the property of a corporation as a fund held in trust for the payment of its debts, and if others than *bona fide* creditors of the corporation, or purchasers, possess themselves of it, they take it charged with this trust, which a court of equity will enforce against them. This is now a well-recognized rule of equity jurisprudence, and the courts of no state have enforced it with more firmness than those of the state which gave corporate entity to both of these corporations. *Bartlett* v. *Drew, 57 N. Y. 587; Lawrence* v. *Nelson, 21 N. Y. 158; McLaren* v. *Pennington, 1 Paige 102; Nathan* v. *Whitlock, 3 Edw. Ch. 215; S. C. on appeal, 9 Paige 152; Curran* v. *State of Arkansas, 15 How. 304; Wood* v. *Dummer, 3 Mason 308; Sawyer* v. *Hoag, 17 Wall. 610; Field on Corp.* § *403.*

The same principle, in a more amplified form, was promulgated by Chancellor Williamson, in *Redmond* v. *Dickerson, 1 Stock. 507*. In that case one of the directors of a corporation had purchased certain machinery for it at one price, and afterwards charged it to the corporation at an advance of $10,000. This charge was made with the consent of the other directors, who, with the director who made the purchase, held all the stock of the corporation. The chancellor was convinced that the $10,000 had been divided among all the directors. The validity of this remarkable transaction was attempted to be defended on the ground that nobody was harmed by it; that inasmuch as the

directors owned all the stock, and they consented, no one else had sufficient interest to éntitle them to be heard.   But the chancellor very pertinently asked :

"Were not the public interested?   Why did the charter require a certain amount of money to be paid in as capital, upon which the company were to do business?   Was it not for the protection of the public, with whom the company were to obtain credit and to deal?   *   *   *   Did it make no difference, though these directors were the sole stockholders, whether the capital was improvidently diminished or safely guarded and preserved as a fund for the future operations of the company?   Was it not a breach of trust for the directors so to speculate on the capital, for their individual benefit, as to lessen the security which the legislature intended to provide for the protection of their dealers and the business community?   The directors of a corporation cannot speculate with its funds or its credit, and take to themselves the profits of their ventures.   Even if they are the only persons interested as stockholders, still they have no right to do so, for such transactions are opposed to the policy of the law, and cannot, in any manner, be countenanced in a court of equity."

No argument is necessary to apply these views to the case in hand, nor to show the pertinency of the principle above adverted to.   The complainants are in no sense *bona fide* creditors or purchasers of the paper company.   They reached their present position by a very devious path.   They took their mortgage with full knowledge that, as against creditors, its execution was an insidious attempt to divert the property of the paper company from its legitimate uses.   Indeed, I think it would be difficult to imagine a transaction more subversive of everything like safety and security in the management and use of corporate property than the one brought in judgment here.

Whether the assent of the stockholders to the conveyance to Tenney will conclude them in case more money should be realized from the sale of the mortgaged premises than shall be sufficient to pay the debts of the paper company, does not fall within the province of this court to consider or decide.   So far as now appears, no citizen of this state is interested as a creditor.   This court is therefore only required to exert an auxiliary jurisdiction. It is only required to put its power in motion, so far as may be necessary to put the property of the corporation, located in this state, in such form that it can be readily and conveniently administered, and, after that is done, to transmit it to the proper

officer, appointed by the courts of the state of New York, to be there administered and distributed according to law.

I am of opinion that the mortgage sued on is without force or validity against the receiver. The bill must, therefore, be dismissed, with costs.