22 N.J. Super. 604 (1952)
92 A.2d 152
MORRIS SILVER, PLAINTIFF,
v.
COMMONWEALTH TRUST COMPANY, A BANKING CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT AND THIRD-PARTY PLAINTIFF,
v.
THE TRUST COMPANY OF NEW JERSEY, A BANKING CORPORATION OF THE STATE OF NEW JERSEY, THIRD-PARTY DEFENDANT.
Superior Court of New Jersey, Hudson County Court Law Division.
Decided October 17, 1952.
*607 Mr. Isidore Parnes, attorney for plaintiff.
Messrs. Burke, Sheridan & Hourigan, attorneys for defendant and third-party plaintiff.
Mr. Thomas E. Lynch, attorney for third-party defendant (Mr. Benjamin Gross, of counsel).
DREWEN, J.C.C.
Commonwealth Trust Company and the Trust Company of New Jersey, defendant banks, move for summary judgment against the plaintiff. Rule 3:56. The suit was brought originally against Commonwealth Trust Company on the ground that it had unlawfully charged plaintiff's account with the sum of $5,000, the face amount of a check drawn by plaintiff to the order of Grantwood *608 Electric, a corporation, and delivered by him to one Eisenberg, for the payee. The check, in accordance with endorsements made by Eisenberg, was deposited by him in a trade name account of his own in the Trust Company of New Jersey. Through routine clearance it was presented to Commonwealth Trust as drawee and paid by it, the check being charged against plaintiff's account. Upon the bringing of plaintiff's suit against it, Commonwealth Trust complained against the Trust Company of New Jersey as third-party defendant on the ground that the latter's endorsement guaranteed the prior endorsements. The banks base their motion for summary judgment mainly upon the contention that Eisenberg's authority as agent of the payee corporation to endorse as he did is sufficiently obvious to warrant the judgment sought.
The facts appear to be undisputed. On or about August 1, 1951 the check in question was presented by Eisenberg to the Trust Company of New Jersey at its West New York Branch for deposit. As presented it bore two endorsements, in Eisenberg's handwriting, the first "Grantwood Elect.," a corporation, and the second "Grantwood Elect. App. Co." The second endorsement is in the trade name of a business, hereinafter called the Appliance Company, then solely owned and conducted by Eisenberg, who had an account in that name at the branch where the check was presented. The bank accepted the check and it was deposited to the credit of Eisenberg's trade name account. In a word, the instrument was one drawn for payment to a corporation and endorsed for deposit in a personal account. The corporation payee had no account with the Trust Company of New Jersey. Plaintiff alleges that no part of the check proceeds reached the corporation.
The Trust Company of New Jersey does not contend that in making the deposit it inquired in any manner concerning the authenticity of the corporate endorsement. It does contend, by way of avoidance, that Eisenberg was competent as the corporate agent to endorse the check and to *609 deposit it as he did. The merit of that contention is the subject of the motion. The law that is basic to the controversy is well established. "A bank which has dealings with a corporation must be assured that an officer who endorses checks payable to the corporation and receives from the bank the proceeds therefrom has such authority." Slavin v. Passaic National Bank & Trust Company, 114 N.J.L. 341 (E. & A. 1935). The same decision is authority for the doctrine that in paying to one other than the designated payee, without due inquiry, a bank disobeys the direction of its depositor and "for such failure must suffer the consequences." It is further declared that "the law holds banks to a strict accountability" in this regard. Callaway v. Hamilton National Bank of Washington, 195 F.2d 556 (D.C. Cir., 1952); Singer Sewing Machine Company v. Citizens National Bank & Trust Company, 111 N.J.L. 199 (Sup. Ct. 1933), affirmed 112 N.J.L. 497 (E. & A. 1934); Wagner Trading Company v. Battery Park National Bank, 228 N.Y. 37, 126 N.E. 347, 9 A.L.R. 340 (N.Y. 1920); Ward v. City Trust Company of N.Y., 192 N.Y. 61, 84 N.E. 585 (N.Y. 1908). It has been held that a bank's acceptance of a check for deposit in a depositor's account is equivalent to the cashing of the check for such depositor. Bryan v. First National Bank, 205 Pa. 7, 54 A. 480 (Pa. 1903); Teas v. Third National Bank & Trust Company, 125 N.J. Eq. 224 (E. & A. 1939). In the last cited case the court says (at p. 227): "There is no substantial difference between an unauthorized endorsement and a forged endorsement, the result being the same in so far as concerns the passing of title." Altogether, the decisions clearly evince a canon of discipline in the relation of banker and depositor that is founded upon necessity, and firmly established. The validity of this principle and its application to the case are not controverted by either defendant.
Certain other pertinent rules of law are equally clear. They bear in general upon the banks' contention for Eisenberg's agency.
*610 "A president of a corporation does not have, by virtue of holding the office of president, any power to endorse chacks, drafts, notes and other obligations payable to the corporation * * *. Where a bank receives a check payable to a corporation and endorsed by the president so as to make it payable to himself, and the president deposits it in his personal account with the bank, the bank is chargeable with notice so as to put it on inquiry to determine whether the president of the corporation was authorized so to use its funds as against the corporation." Dennis Metal Mfg. Co. v. Fidelity Union Trust Company, 99 N.J.L. 365, at 368, (Sup. Ct. 1924).
See also Aerial League of America v. Aircraft Fireproofing Corporation, 97 N.J.L. 530 (E. & A. 1922); Economy, etc., Company v. Fidelity, etc., Company, 105 N.J.L. 206, at 207-8 (E. & A. 1928); Slavin v. Passaic National Bank & Trust Company, supra.
By what do the banks seek to induce the award of a summary judgment? Their argument for competency in the endorser to deal with the check as he did is based upon a somewhat complicated narrative of events and circumstances anterior to the check's issuance. These things are all reported in the submitted depositions and apparently are not in dispute.
Plaintiff is an attorney-at-law of this State. During the period that includes the relevant happenings he was Eisenberg's attorney and rendered him the legal services indicated. The Appliance Company had originally been a partnership, consisting of Eisenberg and one other. It operated a store and salesroom in Cliffside Park, Bergen County. It was a going concern when Eisenberg, in July 1949, caused the corporation Grantwood Electric to be created. Plaintiff, as attorney, filed the document that made the corporate entity de jure, and the franchise tax was paid. Nothing more was done. The corporation has never had officers, directors or stockholders. No stock was ever issued or paid for. It has never held a meeting. Though it remained dormant, its name was prominently displayed on the Cliffside Park premises together with that of the partnership. The depositions *611 leave no doubt that the plan was to transfer all partnership assets to the corporation.
There is also in the pattern of circumstance another client of plaintiff, Comet Embroidery Company, a partnership of the two Goldstein brothers, hereinafter mentioned. In June 1951 Eisenberg informed the plaintiff that he had been given to understand that the Goldsteins might be available for a loan to him (Eisenberg) of a sum sufficient to enable him to acquire the partnership property. The loan was soon made. It was in the sum of $10,000, represented by plaintiff's check, drawn on funds in his trust account in Commonwealth Trust Company, to the order of Eisenberg. In return for the check a note was given, payable to Nathan and Harry Goldstein, trading as Comet Embroidery Company. The makers of the note were the corporation Grantwood Electric, Eisenberg, and Gertrude, his wife. Eisenberg signed for the corporation as president. In addition to the note there was given to the lenders an agreement to pledge as security for its payment the corporate stock of Grantwood Electric, when issued. With $7,500 of the loan Eisenberg purchased his partner's interest in the Appliance Company. The remaining $2,500 he deposited in the Hudson Trust Company of Hoboken, in the account of the corporation, which he had opened there. In the opening of this account Hudson Trust Company required the usual corporate certificate designating the depository, and the persons authorized to transact with it the corporation's banking business. Such a certificate was furnished. In substance it purports to be a copy of a resolution, certified by Gertrude Eisenberg, as secretary, as having been adopted at a meeting of the board of directors held June 28, 1951. The persons therein named as authorized to deal with the bank are the said Eisenberg as president and the said Gertrude as secretary, it being further certified that these persons are "duly qualified and now acting" in their respective offices. We know from what has been already stated that the certificate was and is entirely baseless, its single verity being the statement that Grantwood *612 Electric is a corporation of New Jersey. It does not appear that plaintiff had any knowledge of this certificate. Meanwhile the Appliance Company retained its assets and continued its business. The only change was a dissolution of the partnership, following which a new certificate of the same trade name was filed for Eisenberg alone.
Within a short time Eisenberg applied to plaintiff for a second loan. It was obtained from the same source and perfected by the same method. The amount of it was $5,000, in the form of plaintiff's check drawn on trust funds and dated August 1, 1951. The check was drawn to the corporation. It is the check sub judice. The note given in return for it was the note of the corporation, signed by Eisenberg as president and endorsed by him personally. With the note there was executed and delivered, in the name of the corporation, a trust receipt covering specified merchandise, probably the property of the Appliance Company. According to the terms of the trust receipt, as any item of the pledged merchandise was sold it was to be accounted for by a specified payment on the loan. The reason given by plaintiff for pledging the Appliance Company property was the plan by which all such property was soon to be transferred to the corporation, subject to the Appliance Company's liabilities. It is likely, I take it, that the trust receipt covered all merchandise on hand in the store and salesroom at Cliffside Park.
It becomes important here to note that a similar pledge, upon similar terms, descriptively called in the depositions a "floor plan," had previously been given by the Appliance Company to the Passaic National Bank, and that it was still in force when the second trust certificate was delivered by way of securing the second Goldstein loan. The depositions make it plain that it was this prior pledge that defeated the plan. Eisenberg testifies that he found it impossible to induce Passaic National Bank to consent to the transfer of the Appliance Company merchandise to the corporation, carrying with it the bank's lien. Why this *613 should have been so or why such transfer was necessary is not explained. Whether it would have helped matters does not concern us, but in the situation that developed the proceeds of every sale had to be appropriated to the loan in whole or in substantial part, with the result that, lacking adequate capital, there was no way to prevent a liquidation of inventory without replenishment. Eisenberg was compelled to resort, as he frankly tells it, to the indiscriminate use of corporation and Appliance Company checks. Checks to the corporation were endorsed by Eisenberg in the corporate name and deposited in the Appliance Company account. He admits having done this repeatedly and identifies some of the checks. He says he had to do it in order to keep enough funds in the Appliance Company account to meet outstanding checks against it. What these outstanding checks were for he does not state, some of them possibly for payment to the Passaic National Bank; but he emphatically affirms his recognition that the procedure was wrong; and he accounts for the banks' part in it by saying that they "just slipped up." It might well be that Eisenberg's share in the instant transaction was a feature of the situation he describes.
Although in the depositions the Goldstein loans are given some scrutiny, no point is made respecting a bonus or usury in any form. The very check in issue represents a loan; and the creditor hazard involved in the banking process through which the check was passed permeates and qualifies the whole problem. The protection of creditors is within the purview of the principle that is basic here, that is the principle which makes it the bank's duty to pay out funds only to those directed. In Futurity Realty Corp. v. Passaic Nat. Bank & Trust Company, 2 N.J. Super. 175 (Ch. Div. 1948) it is declared (p. 180): "The rule that a corporation shall not give away its property is established for the benefit of creditors and stockholders. If creditors are not harmed, and all the stockholders consent, the transaction is not objectionable." In decisions dealing with the problem of authority to dispose of corporate funds or equities, a common *614 feature is the court's preoccupation with the protection of creditors. Perkins v. Trinity Realty Co., 69 N.J. Eq. 723, at 730 (Ch. 1905), affirmed 71 N.J. Eq. 304 (E. & A. 1906); Morse v. Metropolitan Steamship Co., 87 N.J. Eq. 217, at 221 (Ch. 1917), affirmed 88 N.J. Eq. 325 (E. & A. 1917); Heidler v. Werner Co., 97 N.J. Eq. 505, at 507 (E. & A. 1925); National Bank of Republic v. Young, 41 N.J. Eq. 531, at 535 (E. & A. 1886); National Trust Co. v. Miller, 33 N.J. Eq. 155, at 162 (Ch. 1880); Demarest v. Spiral Riveted Tube Co., 71 N.J.L. 14 (Sup. Ct. 1904). True, the principle is not presently involved in an equity cause, yet the foregoing precedents do further clarify the principle's full dimension.
Coming now to particulars, upon what, in all the attendant circumstances, do the banks predicate the claim that Eisenberg was "a duly authorized agent"? It is true that within the meaning of R.S. 7:2-19 agency may be established by a course of conduct. But the only course of conduct here that bears upon the question is a sequence of designed irregularities. The establishment of agency must be legitimate. In support of their contention under this head the banks rely on Buck v. Troy Aqueduct Co., 76 Vt. 75, 56 A. 285 (Sup.Ct.Vt. 1903) and Herman v. Brickman, 8 N.J. Super. 204 (App. Div. 1950). At least one substantial difference between the situations presented in the two cited cases and the situation before us is that there the consideration went in each instance directly to the corporation, while here it did not; and it is still an open question whether the fund or any benefit of it ever reached the corporation at all.
With respect to estoppel, insofar as it depends upon the prior conduct of the corporation as evinced in Eisenberg's furnishing a certificate of authority to the Hudson Trust Company, signing and endorsing notes and pledging assets, it is to be noted that all these things  except the certificate, which I judge to have no effect in this controversy  were the results of specific requirement of the *615 plaintiff in getting security for his lending clients. Some of these exactions, considering the two loans together, were legally sound, others not. The former sort can alter no standard, and the latter can create none. All this, however, was not in the disbursing but in the acquiring of funds. Moreover, the banks knew nothing of any of these antecedent matters and were not in the least influenced by them in dealing with the check in question. See Callaway v. Hamilton National Bank of Washington, supra, 195 F.2d at p. 562, and cases cited. In the case before us the facts are concretely sufficient. The deposit in itself was a diversion, and nothing more was needed than the check and its endorsements for a complete betokening to the bank of deposit that it was participating in the diversion. An unauthorized signature is "wholly inoperative" and equal to a forgery. R.S. 7:2-23. Returning for a moment to the certificate furnished the Hudson Trust Company, and assuming that to have been entirely regular, its effect is restricted to the corporate relation with the bank that obtained it. Cf. O'Connor v. First Bank & Trust Co., 12 N.J. Super. 281 (App. Div. 1951).
The case is somewhat peculiar in the feature of plaintiff's relation as attorney to the legal and factual circumstances surrounding the issuance of the check and the affairs of the corporate payee. The banks rely heavily on this; repeatedly argument is sought to be enhanced with the phrase "especially so far as this plaintiff is concerned." Naturally enough the question does arise, in what manner plaintiff could have expected the check to be negotiated, and who he thought was authorized in that regard. But I do not see how that becomes relevant. In the complete absence of connective influence between the conduct of the attorney and that of the depositing bank there is nothing but to appraise separately their separate doings. Under the circumstances the argument for the contrary of this sounds in opportunism. The bank was given not the slightest reason for treating this check save as it is legally required to treat all checks *616 of its kind. There is testimony by the plaintiff that as attorney for the lenders it was his purpose to be assured, in drawing the check as he did, that the funds would go into the corporate account. That purpose cannot be quarreled with and on this motion must be taken as stated. Whatever is to be said of plaintiff's ineptitudes, legal or otherwise, the banks were neither deceived nor prejudiced by them; nor is there anything that suggests even tacit assent to authority in Eisenberg for the diversion of funds. And here again we must remember how unmistakable was the total indicium of the check and its endorsements upon its presentation for deposit. Under the banks strict accountability a "customer is not precluded from recovering simply because he has been lax in the conduct of his business affairs." Callaway v. Hamilton National Bank, supra, 195 F.2d, at p. 562. The last case cited is closely analogous to several aspects of the present one.
Next, is it to be supposed that because of nothing more than the inchoate corporate status, that is a status without implementing personnel, an agency of necessity arises to correct the absence of persons normally authorized? I should say that the law affords no such encouragement to corporate laxity; that the device would be operative only to prevent a prejudicial or fraudulent corporate advantage over another; and that even in such case the rule could not be given the effect of nullifying so important a function of banks as obedience to the prime canon of caution that now concerns us.
Finally, what of the proposition that Eisenberg was the legal or beneficial owner of all the corporate assets? In the first place, the proofs do not support this. We know only the indicated plan. What the actual developments were in creating rights or interests, if any, is not shown. Eisenberg apparently consulted no one. It was contemplated, as the law requires, that there be two other stockholders besides himself. It is extremely doubtful whether stockholders under any circumstances can make gratuities of *617 corporate assets, apart from the transfer of stock ownership. One theme of doubt on this score is public policy. Certainly they may not give away corporate assets when the rights of creditors are involved. The authorities cited affirm this clearly. The rights of the Goldsteins  and of the plaintiff, their transacting agent  as holders of the corporate note for the very check that is here in question were and are immediately involved.
A case for summary judgment as matter of law must be shown palpably. Rules 5:2-1; 3:56-3. No such showing, in my opinion, is made here and the motion must therefore be denied.
It will not be amiss to anticipate the pretrial conference in this action. Clarification of the issue for ultimate decision can be greatly aided by a full use of that procedure. I suggest that definite effort be made to determine whether the case involves disputes of material fact, and if so, that they be specified. But I deem it important also that the pretrial order include a stipulation of detail covering the Appliance Company account at and after the making of this deposit, with the amounts and dates of disbursements, a statement of balances and the purposes for which the disbursements were made. I do not see how all aspects of the case can be meritoriously presented without that proof. The depositions leave no doubt that the plan was in course of consummation for vesting in the corporation what were or had been the Appliance Company assets, subject to the latter's liabilities. How much, if any, of the deposit went to the discharge of such liabilities, or other purposes in the corporate interest, does not appear. But the evidence appears to me to be clearly relevant, as bearing on the question whether actual misappropriation did result.